UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 20-30028-MGM |
| ) | |
| JAMES LAFRANCE ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Jim LaFrance's behavior once he fell down the rabbit hole of internet deviancy is deeply troubling and merits punishment. That is undisputed, least of all by LaFrance himself. Accordingly, the relevant question before the Court is whether LaFrance, now 65 years-old, should be released from prison in his late seventies (as the statutory mandatory minimum 15-year sentence requires) or must await release to supervision by the Probation Department until he is well into his eighties (as the sentencing guideline and the government recommend). As explained below, the nominally applicable guideline is of little assistance in determining a sufficient sentence given the nature and circumstances of LaFrance's offense. The risk that LaFrance will recidivate – the chief argument by the government in arguing for a 19 ½ year sentence - is effectively zero once released to supervision, regardless of what sentence the Court imposes. LaFrance's age, pre-existing medical condition, and the draconian consequences of the COVID-19 pandemic on the Bureau of Prisons' already fragile ability to care for elderly prisoners will together ensure that LaFrance's service of his sentence will be especially dreadful, manifestly satisfying the need for the punishment to fit the crime. For the reasons that follow, a sentence of 180 months followed by five years of supervised release for Jim LaFrance is "sufficient but not greater than necessary" to achieve the goals of sentencing.  18 U.S.C. § 3553(a)(1).

# INTRODUCTION

A. **Nature and Circumstances of LaFrance's Offense and His History and Characteristics**

LaFrance was born and raised in the Berkshires. At the time of the offenses and his subsequent arrest he had been married to his wife Missy for 34 years. The two raised a daughter, Lindsay, now 30 years-old. The early years of the couple's marriage were humble – the pair began married life in a mobile home in Williamstown, later moving to Pittsfield before eventually settling into their current home in Dalton.

Notwithstanding some bumps in the road, the couple was dedicated to their marriage and the family thrived over the next decades. To a person, those who know LaFrance – his sisters, his daughter, his wife – comment on what a caring and loving brother, father, and partner he is, a man who always put his family first. *See* Letters in Support (attached hereto as Exhibit A). Missy describes him as a role model, a theme echoed by others. *Id.* at 1-2; *id.* at 8 (Letter of Ariel Ramirez).

LaFrance found his calling as an automobile salesman, a career at which he excelled. Decades of hard work produced professional and financial success, ensuring a comfortable retirement for him and his wife as they grew older.  A diagnosis of chronic cardiac and hypertension problems on the horizon, however, along with longstanding osteoarthritis and osteoporosis, nudged him to retire earlier than once planned. By so doing he hoped to live as much of an enriching retirement as possible before the inevitable cardiac and other issues would severely limit his physical mobility and capacity to travel. In contemplating retirement life, he and Missy looked forward to the expanded leisure time that would permit them to continue to socialize with the large circle of friends they had acquired over the years. *See* Letter of Debra Tart, Exhibit A at 5. They also envisioned indulging in the couple's passions – hiking, boating, cooking, and dining out free from the stress and worry of work. *Id.*

But it did not turn out that way. Instead of reveling in his newfound freedom, LaFrance found himself lonely and isolated. His wife and cohort of friends continued to work, leaving him with little to do or to look forward to on a day-to-day basis. As his wife Missy puts it, "[I] saw a change in him once he entered retirement. He appeared depressed and often when [I] came home from work, he was bored and in a rut." PSR ¶ 65. He began spending hours surfing the internet and gravitated to chat rooms, drawn into the world where he could relive his salad years by masquerading as a young man. He was gradually pulled into a world where teenagers seemed willing - sometimes, as in the offense at issue here, with minimal persuasion – to perform for him nude on live video. This new revelation of the dark corners of the internet took hold, blossomed into addiction, and eventually turned into an obsession. His fall into the rabbit hole ended with his arrest by state authorities, discovery of the recordings he had made of the two sixteen-year-olds, and the instant indictment in federal court.

As serious and manifestly troubling as LaFrance's conduct was, it is notable for what LaFrance did not do. The "production" that took place was solely personal; there is no evidence whatsoever that LaFrance tried to or even contemplated distribution of the videos. Nor is there the trove of child pornography that nearly always accompanies the discovery of a pornographer. Instead, this is a case where LaFrance found and encouraged two sixteen year-old girls into performing for him and hit the record button on an application to memorialize it for himself. For that behavior, LaFrance faces a mandatory minimum sentence of 180 months imprisonment.

Also notable is the support he continues to receive from close friends and family. *See* PSR ¶¶ 65, 67; Exhibit A. While uniformly horrified at the conduct that led to his arrest by local and federal authorities, they are nonetheless empathetic for the Jim LaFrance they have known for decades. *Id.* Likewise, LaFrance is mortified by his conduct and the destruction it has wrought on him and those close to him.

# ARGUMENT

**The Nature and Circumstances of LaFrance's Offense, in Conjunction with His History and Characteristics, Compels the Conclusion that a Sentence of 180 Months' Imprisonment Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007),[1] it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id*. at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242- 43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id*. at 101; *Pepper*, 131 S. Ct. at 1242-43.

Here, all of the purposes of sentencing point in the same direction, a sentence at the mandatory minimum 15 years. As explained below, LaFrance's conduct, while serious, is less so than the offenses Congress had in mind as it has increased sentences (and the Sentencing Commission's parallel advisory guidelines) in the last two decades. Put another way, LaFrance

---

[11] Defendant recognizes that the Probation Department has calculated the advisory guideline sentencing range higher than agreed to by the parties in the plea agreement. For the reasons stated in defendant's objection, which appears in the Presentence Report's Addendum, defendant disputes the applicability of the two-point enhancement for sexual contact. In defendant's view, *United States v. Shafer*, 573 F.3d 267 (6th Cir. 2009) is inapposite. There, the Sixth Circuit put great store in the fact that the masturbation at issue was "compelled" by the defendant, *id.* at 273, a feature absent in the encounters between LaFrance and the two teenagers here. Regardless, for the reasons set forth in this Memorandum defendant submits that a sentence at the mandatory minimum is manifestly sufficient and joins the government in urging the court to leave for another day in another case the parameters of the enhancement. *See Government Sentencing Memorandum* (D.E. 33) at 1 fn.1.

is not the dangerous offender Congress envisioned. Regardless, his age, family circumstances, education and prior employment history all point to a very low risk of further offending once released from prison to further supervision. Incarceration past his late seventies is therefore not necessary to protect the public, and would be a particularly harsh punishment for LaFrance, who at age 65 already faces a decade and half of incarceration where he otherwise would have been living out his retirement dream. His serious, preexisting health problems are highly unlikely to be adequately treated in prison, and his health issues will make him unable to protect himself against any violence that might befall him while incarcerated. In sum, a sentence at the mandatory minimum 180 months imprisonment is sufficient punishment. No more is required.

**I.      The Calculated Guideline Sentencing Range Is of Vanishingly Little Help in Determining a Sufficient, But Not Greater Than Necessary Sentence in LaFrance's Case.**

Until 1998, a production offense carried a maximum penalty of ten years with no required minimum sentence. In the next five years, Congress tripled the maximum sentence as part of its wholesale ratcheting up of child pornography penalties culminating in the PROTECT Act, which, in addition to extending the maximum sentence to thirty years, enacted the statutorily required minimum fifteen-year sentence LaFrance now faces. The upward trajectory in penalties was a product of Congress's efforts to stem the commercial, and later the online, trade of child pornography. *See, e.g.*, PROTECT Act, PL 108–21, § 501, April 30, 2003, 117 Stat 650 (legislative finding that the "most expeditious way" available to law enforcement to battle child pornography is to "dry up the market for this material" by "imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product").

The Sentencing Commission followed Congress's lead and direction over the years with parallel increases in § 2G2.1's base offense level. In response the PROTECT Act's exponential increase in the applicable mandatory minimums and maximums, for example, the Sentencing

Commission was compelled to raise the base offense level for production offenses from 27 to 32 and to add additional enhancements that might potentially apply. U.S. Sentencing Commission, Amendment 664.

The high guideline levels connected with Congressional meddling in child pornography sentences have been roundly criticized by the courts. *See United States v. Dorvee*, 616 F.3d 616 F.3d 174, 184-85, 187-188 (2nd Cir. 2010)(describing the child pornography guideline as "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results" where mechanical application of the guidelines was "fundamentally incompatible with § 3553(a)."  Not surprisingly, the judicial unease over the upward ratcheting of the guidelines extends to production cases. A recent study of sentencing practices in production cases undertaken by the Sentencing Commission noted that the rate of downward variance from advisory guideline sentencing ranges in production cases is substantially higher than in other categories of cases. U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography Production Offenses* (October 2021) ("Production Offenses Report") at 3 *Key Findings 2* (a majority of production offenders - 57.2% - received a variance below the applicable guideline range).

Two guideline enhancements that apply in LaFrance's case, "use of a computer" (PSR ¶¶ 25, 32) and pattern of conduct (PSR ¶ 4), constitute precisely the kind mechanical calculation that courts have and should view skeptically when assessing the relationship between the guideline calculation and a reasonable sentence. The ubiquity of computer use has rendered the characterization of "use of a computer" as a "specific offense characteristic" manifestly *unspecific*; the Sentencing Commission found that it applied to 96.3% of all child pornography offenders sentencing under U.S.S.G. § 2G2.2. U.S. Sent'g Comm'n, *Report to the Congress:*

*Federal Child Pornography Offenses* at 5, 209 (2012).[2] Its use as a "specific offense characteristic" in production offenses like LaFrance's is likewise undiscerning. As did LaFrance here, nearly half of all production offenders used a computer or interactive mobile device to communicate to effectuate the offense. *Production Report* at 31. *See Dorvee*, 616 F.3d at 186 (criticizing application of enhancements, such as use of computer, "that are all but inherent to the crime of conviction"). Such a broad application of a supposedly "specific offense characteristic" renders it of little efficacy in determining relative culpability and is therefore effectively meaningless. Without the additional two points assessed for use of a computer, LaFrance, pursuant to the parties' calculation, would face an advisory sentencing range of 188-235, with the low-end of the guideline exceeding the mandatory minimum 15-year sentence by just eight months.

Likewise, the mechanical application of a U.S.S.G. §4B1.5(b)'s whopping five-point increase to address "repeat and dangerous sex offenders," which does not require a prior conviction to apply, should be viewed with substantial skepticism in the effort to determine an individualized sentence. The Sentencing Commission reports that the enhancement now applies to more than half - 51.6% - of all defendants sentenced under U.S.S.G. §2G2.1. *Production Report* at 19. And as the Commission notes, application of the "repeat and dangerous" enhancement has more than doubled since 2010, with all of the increases attributable not to defendants with prior convictions, *see* U.S.S.G. §4B1.5(a), but instead to those, like LaFrance, with less extensive or no criminal records but whose *offense* conduct involves more than one instance of prohibited sexual conduct. *Id.* Like the use of a computer enhancement, the increasing prevalence of the "repeat and dangerous" enhancement undercuts its efficacy in

---

[2] Available at http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

- 7 -

determining relative culpability.³ Rather, it appears to have become yet another enhancement that is "all but inherent in the crime of conviction." *Dorvee*, 616 F.3d at 186. Without the "repeat and dangerous sex offender" enhancement, LaFrance under the parties' calculation would face an advisory sentencing range of 168-210 months, where the low-end of the guideline is significantly below the required mandatory minimum sentence of fifteen years. Without both the computer enhancement and the §4B1.5(b) "repeat" enhancement, LaFrance would face an advisory guideline sentencing range of 135-168, far below the mandatory fifteen-year sentence this Court is required to impose.

Quite aside from the mechanical application problems inherent in the §2G2.1 guideline, the Sentencing Commission's recent *Production Report* identifies several aggravating features of child pornography production cases that support an increased sentence under current practices but are absent from LaFrance's offense conduct in this case. The absence of these features is itself an ample basis for a variance below the advisory guideline range. They include the following:

- **Production offenders typically maintain a position of trust over the victim (*Production Report* at 4):** The Sentencing Commission found that the existence of familial relationships, or an otherwise trusted role such as a teacher or coach, were at the center of 60.3% of production offenses. LaFrance had no such relationship nor acted in any such role as to either teen.

- **Proximity of production offenders to their victims correlates with victimization of younger, prepubescent victims (*Production Report* at 5)**: The Sentencing Commission noted offenders who communicated with victims in person were far more likely to have victimized

---

³ To be clear, a defendant does not go unpunished for involving more than one victim in the production offense if U.S.S.G. §4B1.5(b) is discounted. The Guidelines Sentencing Manual provides that conduct involving multiple victims are not grouped. U.S.S.G. §3D1.2. In LaFrance's case, this results in a two-point increase in offense level. PSR ¶ 37.

young children, an aggravating statutory and guideline factor. Here, LaFrance's behavior was remote and targeted at developed teenagers. Consistent with the Sentencing Commission's finding, there is not a hint of a whisper that LaFrance harbored a predilection for in-person offending with children age twelve or younger.

- **The longest sentences in production cases were driven by victimization of infants or toddlers, where parental relationships gave offenders access to victims, where offenders engaged in or facilitated sexual contact to produce the pornography, or where they incapacitated the victim (*Production Report* at 7):** The Sentencing Commission culled these four specific factors as correlative to longer sentences imposed. None applies to LaFrance's behavior in soliciting teenagers to perform for him by video and recording the sessions for his own personal gratification.

In sum, to produce a sentence that is "sufficient, but not greater than necessary" the Court must weigh sentencing practices and the § 3553(a) factors in this case to avoid unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108. Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing: "[u]nwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004). Assessing LaFrance's offense conduct against the backdrop of actual real world sentencing outcomes, the data show that a sentence of 180 months imprisonment followed by five years of supervised release does not create unwarranted disparity. Instead, it promotes the need for individualized assessment of factors relevant to the goals of sentencing. And as set forth below, those goals likewise

- 9 -

support a sentence no longer than the mandatorily required 180 months – fifteen years - imprisonment.

**II.     LaFrance's Low Risk of Recidivism Supports a Sentence No Longer Than 180 Months**

Regardless of whether the Court sentences him to 180 months or 235 months, LaFrance will be in his late seventies when released, an age where recidivism generally and sex offender recidivism specifically declines precipitously. The Sentencing Commission has found that overall recidivism rates consistently drop as offenders age. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Key Findings) (December 2017) (available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders). For offenders like LaFrance who are over 60 with no criminal history, the re-arrest rate across all offenses was just 11.3%. *Id.* at Appendix A-44. Moreover, about a quarter of what arrests occurred were for "public order offenses," defined as "violations of conditions of federal probation, federal supervised release, or state parole and crimes such as obstruction of justice and failure to appear." *Id.* at 3 and fn.6. In addition, the Sentencing Commission's findings note that the overall re-arrest rate was skewed higher by offenders convicted of drug trafficking and firearms possession, strongly suggesting that the actual rate of re-arrest for those convicted of non-drug non-firearm offenses is far lower than even the 11.3%.

The Office of the Inspector General reached the same results in a 2015 study. Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, (May 2015) (available at https://oig.justice.gov/reports/2015/e1505.pdf). The study was based on 381 inmates over age 50 released between 2006 at 2010. *Id* at 39. The three-year arrest rate for inmates age 55-59 at time of release was 16%. *Id*. For inmates age 60-64 at time of

release it dropped to 8%. *Id*. LaFrance, of course will be in his late seventies by the time of release, an age that suggests an even lower risk of recidivism.

The sharply diminished risk of recidivism due to age appears even more pronounced in sex offender cases. Nationally recognized studies have reported that the average sexual recidivism rate for sixty year-olds falls below 6%.[4] As noted, LaFrance in his late seventies will be almost two decades older than the 60 year-old cohort cut-off that portends exceedingly low risk; his risk of recidivism can be expected to decrease even more dramatically.

In short, there is no support for the government's assertion that LaFrance's risk to reoffend is significant enough to merit a sentence four and half years above the mandatory 180 months.

Indeed, there is ample support that LaFrance's risk will be far lower. LaFrance has not received a single disciplinary report in the more than two years he has been in state custody. Furthermore, as the Presentence Report and the letters contained in Exhibit A attest, LaFrance has the support in his family and close circle of friends – a community that is fully aware of LaFrance's offense - that he can call upon to assist him when released from his sentence.

Finally, LaFrance when released will be subject to sex offender-specific conditions of supervised release – thirteen (13) special conditions in all - including internet monitoring, sex offender treatment, and third-party risk notification.

As intrusive as the conditions are, LaFrance's record while incarcerated, his decades-long history of good works in the community, the substantial social ties he can rely on once released

---

[4] Barbaree, H. E. & Blanchard, R. (2008). Sexual deviance over the lifespan: Reductions in deviant sexual behavior in the aging offender. In D. R. Laws & W. O'Donohue (Eds.). (pp. 37–60). Sexual deviance: theory, assessment, and treatment. New York: Guilford; Barbaree, H. E., Blanchard, R. & Langton, C. (2003). The development of sexual aggression through the lifespan. In R. A. Prentky, E. Janus & M. Seto (Eds.), Sexually coercive behavior. New York: Annals of the New York Academy of Sciences (Vol. 989) Barbaree, H. (2010). The Effects of Aging on Sex Offender Recidivism. Presented at the Department of Health Sex Offender Commitment Program. Seaside, CA.

all point to successful compliance while on post-release supervision. When added to a 180-month sentence, LaFrance will be in his mid-eighties or more before he is again free of strict supervision. Even then, he will be required to register as a sex offender for the rest of his life. In short, LaFrance's liberty will forever be curtailed because of what he has done and a sentence beyond the mandatory minimum 15 years is simply unnecessary.

In sum, the government's assertion that LaFrance might present a future danger to the community – "the very portrait of the online predator that parents fear," *Gov't Memo* at 3 - is unsupported. It does not provide a basis for a sentence four and one-half years more than the mandatory minimum 180-month sentence the Court must impose.

**III.    A Sentence of 180 Months in the Bureau of Prisons Is Particularly Severe for an Offender Like LaFrance Given His Age and Medical Condition.**

Whatever sentence the Court selects, LaFrance will spend the remainder of his sixties and most of his seventies in the Federal Bureau of Prisons ("BoP"), which has long been ill-equipped to care for elderly inmates and the associated medical conditions they present. A 2008 audit by the Office of the Inspector General found systemic deficiencies in the BoP's delivery of health services. U.S. Dept. of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prisons Efforts to Manage Inmate Health Care*, ii-xix, 32-34 (2008) (available at https://oig.justice.gov/reports/BOP/a0808/final.pdf). In 2016, the OIG issued a related report that reviewed the BoP's medical staffing challenges. U.S. Dept. of Justice, Office of the Inspector General Evaluation and Inspections Divisions, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) (available at https://oig.justice.gov/reports/2016/e1602.pdf). The review found that chronic staffing shortages "limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." *Id* at i.

As the PSR and records submitted to the Probation Department demonstrate, LaFrance suffers from chronic hypertension and chronic cardiac issues, as well as sever osteoporosis that has already resulted in the need for two hip replacements. PSR ¶¶ 68-69. His medical issues have gone largely untreated while in state custody and there is little reason to believe the BoP will be any more attentive. The OIG's report specifically flagged the identification and treatment of cardiovascular issues, such as LaFrance's hypertension, atrial fibrillation and need for cardiac monitoring and care, and called on BoP to address the concerns. *Id.* By all accounts it has been simply unwilling or unable to do so. LaFrance's health will inevitably decline as he serves his sentence into his late seventies and he will require more of exactly the kind of coronary care and other services BoP has been faulted for failing to provide, even before the health services crisis BoP is now in the midst of.

The COVID-19 pandemic has exacerbated the BoP's challenge immensely. BoP's already deficient medical resources have proven utterly insufficient to cope with the task of caring for ill prisoners, with catastrophic results. *See* New York Times, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide* (June 16, 2020) (noting, among other things, inconsistent and nonexistent testing of inmate populations);[5] New Yorker Magazine, *Punishment by Pandemic* (June 15, 2020) (documenting indifferent response by facilities to inmate heath during the pandemic).[6]

In short, there can be no serious argument that BoP's delivery of healthcare to inmates is spectacularly inadequate and will remain so throughout LaFrance's term of imprisonment. Congress has mandated that the Court consider the most effective treatment of LaFrance's existing and inescapable future medical issues when fashioning the sentence. 18 U.S.C. § 3553(a)(2)(D). In light of the Inspector General's audit and BoP's continuing failure through the

---

[5] Available at https://www.nytimes.mcgm/2020/06/16/us/coronavirus-inmates-prisons-jails.html.
[6] Available at https://www.newyorker.com/magazine/2020/06/22/punishment-by-pandemic.

coronavirus pandemic to address life-threatening health issues, there is little reason to believe that BoP will provide even adequate treatment, let alone the most effective treatment, for the inevitable health issues LaFrance faces in the coming years. Given this reality, a sentence in excess of the 180-months mandatory minimum sentence is far greater than necessary to achieve § 3553(a)'s goals.

IV. **A Sentence of 180 Months Is Manifestly Just Punishment.**

The calculus of what is "just punishment" or "just desserts" is not readily graspable, let alone what whether a sentence is "sufficient but not greater than necessary" to achieve it. It can be particularly difficult where, as dreadful as his conduct was, LaFrance's behavior was short-lived in an otherwise well-tended life.

LaFrance's life has been irrevocably destroyed. He has watched while those around him – his wife, daughter, siblings, and friends – came to terms with the shame he brough not only on himself but them as well. His wife, while supportive of the good things LaFrance had brought to the marriage, quickly filed for divorce. He will helplessly witness from afar while his wife tries to enjoy the active and fulfilling retirement the two had dreamed of spending together. His days will instead be spent enduring the myriad indignities and stupefying boredom that is life in a medium security prison.

And enduring that experience will not be easy. Offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004).[7] Offenders who committed their first crime after the age of fifty "have problems adjusting to prison since they are new to the environment, which will cause underlying

---

[7] Available at http://www.nicic.org/pubs/2004/018735.pdf.

stress and probable stress-related health problems," and they are "easy prey" for more experienced inmates. *Id*. at 10.[8] For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma." Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity*, in *The Effects of Imprisonment* 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005).

Moreover, the lingering effects of the COVID-19 pandemic mean that after his sentencings in this Court and in the follow-on state court matter, LaFrance he will have to remain in local custody for months. When he finally is transferred to the BoP, it is nearly certain LaFrance will return to abysmal conditions featuring isolation and solitary confinement. *See* Reason Magazine, *Solitary Confinement in U.S. Prisons Spiked by 500 Percent When Coronavirus Hit* (June 15, 2020) (noting that the largest contributor to the increase in the use of solitary confinement "by far" is the Bureau of Prisons, where roughly 163,000 inmates have been on various forms of modified lockdown since late March).[9] The very measures which experts suggest are the only way to make detention facilities safe for the duration of the pandemic are what deprive the inmates of any rehabilitation programming, regular recreation, or regular visits, completely thwarting the statutory goal that a sentence "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(4).

---

[8] LaFrance's cardiac condition is unstable. A sex offender who is too elderly and infirm to defend himself may face the harshest possible consequences. As one judge reported: "The last defendant this Court was required to sentence to the mandatory five-year prison term for receipt of child pornography, a 72–year old retired attorney, was beaten to death within days of arriving at the federal penitentiary." *United States v. Kelly*, 868 F. Supp. 2d 1202, 1204 n.1 (D.NM 2012).
[9] Numerous commentators have suggested that prolonged solitary confinement is akin to torture. *See, e.g.* Atul Gawnde, *Is Long-Term Solitary Confinement Torture?"* The New Yorker (March 23, 2009), available at https://www.newyorker.com/magazine/2009/03/30/hellhole.

The result is that a form of incarceration featuring segregation and lockdowns that ordinarily would only be reserved as an additional punishment for serious disciplinary violations is now the norm. It is this horrific consequence, in addition to the indifference to his medical issues outlined above, that LaFrance will be suffering for his conduct as he finishes the remainder of his sentence and life. The lengths of sentences assigned to impose "just punishment" under normal circumstances simply do not apply in these dramatically abnormal circumstances, because the same period of incarceration results in objectively much more severe punishment.

Irrespective of the sentence this Court imposes, LaFrance's conviction will haunt him the rest of his life. He will be required to register as a sex offender when released, with the publication of that information to the community and his friends and neighbors. As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment" and "adequate deterrence"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the

history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

If a fifteen-year sentence in these extraordinary circumstances is not enough of a consequence of his conduct – it is - LaFrance will continue to live with the consequences of what he has done when released. His movements will be watched. He will be prohibited from living in broad swaths of the community and prohibited from having any unsupervised contact with children. He will report to the police as a sex offender for the rest of his life. By any measure, the government's stated aim that LaFrance suffer the consequences of his conduct every day for the rest of his life has been achieved. There is no need for a sentence that extends beyond the mandatorily required 15 years.

## CONCLUSION

For the foregoing reasons, a sentence of 180 months' imprisonment with five years of supervised release to follow is manifestly "sufficient, but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a). The Court should therefore impose it. The Court should recommend that LaFrance be designated to facility close to his home that can provide the medical care required to address his chronic physical ailments.

JAMES LAFRANCE
By his attorney,

/s/ Timothy G. Watkins
Timothy G. Watkins
Federal Defender Office
51 Sleeper Street, Fifth Floor
Boston, MA  02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 17, 2021.

/s/ Timothy G. Watkins
Timothy G. Watkins